**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHESTINE G., | |
| Plaintiff, | |
| | Case No. 18 C 4980 |
| v. | |
| | Magistrate Judge Sunil R. Harjani |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Chestine G. ("Chestine") seeks judicial review of the final decision of the Commissioner of Social Security partially denying her applications for disability insurance benefits and supplemental security income. The parties filed cross-motions for summary judgment. For the following reasons, Chestine's motion [30] is denied, the Commissioner's motion [38] is granted, and the decision of the ALJ is affirmed.

## BACKGROUND

While working as an assistant furniture manager for Homeowner's Bargain Outlet ("HOBO") in December 2009, Chestine, then 48 years old, slipped on dirt in a stockroom and fell fracturing her cervical spine and injuring her back. Three months later in March 2010, Chestine injured her left arm and shoulder to her neck while catching a falling 50-60 pound table at HOBO. Chestine last worked in June 2010. In April 2012, Chestine applied for Social Security disability benefits, claiming she was unable to work as of June 3, 2010 due to three herniated discs, injured left hip, shoulder, and neck, pain in right cheek buttock, and left arm injury. In April 2013, an administrative law judge denied Chestine's applications, concluding that she retained the residual

functional capacity to perform a range of light work. In April 2015, after the ALJ's decision, Chestine was involved in a car accident which exacerbated her symptoms. On December 5, 2016, a district judge reversed the ALJ's April 2013 decision and remanded her case, directing the administrative law judge to assess whether Chestine "has established that she will consistently be absent from work for medical reasons for a certain number of days per month and consideration of the VE's testimony that absences of more than one day per month would be preclusive of maintaining gainful employment." (R. 913).

After a second hearing, the ALJ issued a partially favorable decision. She determined that Chestine had severe impairments related to degenerative changes to her cervical and lumbar spine and left shoulder supraspinatus tendinosis and awarded benefits for the period from August 14, 2013 through May 5, 2015. The ALJ determined Chestine was not disabled before August 14, 2013 and after May 5, 2015. The ALJ's findings were based on the opinion of a testifying medical expert ("ME"), Dr. Ashok Jilhewar, who reviewed the record. At a second hearing, Dr. Jilhewar testified that during that period between August 14, 2013 and May 5, 2013, epidural steroid injections into Chestine's spine would result in her being absent from work greater than one day per month and thus, the ongoing impact of such treatment would be of sufficient severity to medically equal Listing 1.04A. Prior to August 14, 2013 and beginning May 6, 2015, the ALJ determined that Chestine could perform a range of light work with certain limitations: no climbing of ladders, ropes, or scaffolds and no more than frequent reaching in all directions, handling, and fingering.

**DISCUSSION**

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A disability recipient may be determined not to be entitled to receive benefits if there is "substantial evidence which demonstrates that (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). An eight-step sequential evaluation process, which is described more fully below, governs a determination regarding a claimant's medical improvement, the primary issue in this case. 20 C.F.R. § 404.1594.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). In reviewing an ALJ's decision, the Court may "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 940-41 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's

"decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Chestine raises four main arguments challenging the ALJ's second decision. First, Chestine argues that the ALJ failed to properly apply the medical improvement standard. Second, Chestine argues that the ALJ's post-May 5, 2015 RFC finding is not supported by substantial evidence. Third, Chestine argues that the ALJ erred by giving greater weight to the testifying medical expert than to her treating physician. Last, Chestine contends that the ALJ failed to resolve a conflict between the VE's testimony and the DOT as required under SSR 00-4p. Because the ALJ's decision was supported by substantial evidence, the Court affirms that decision.

## A.      Medical Improvement

Medical improvement is "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." 20 C.F.R. § 404.1594(b)(1). Medical improvement "is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594(c)(1). The medical improvement determination is informed by an eight step-evaluation. 20 C.F.R. § 404.1594(f).[1]

---

[1]      For an SSI claim, the performance of substantial gainful activity is not a factor used to determine if the claimant's disability continues, and the analysis starts with step two. 20 C.F.R. § 416.994(b)(5). Steps two through eight of a DIB claim evaluation process are identical to the seven-step process used to evaluate an SSI claim. 20 C.F.R. §§ 404.1594(f), 416.994(b). For convenience, the Court will only cite to the DIB medical improvement regulations.

Chestine contends that the ALJ's finding that medical improvement occurred as of May 6, 2015 is not supported by substantial evidence because the ALJ: (1) failed to describe and apply the eight-step medical improvement sequential evaluation process and (2) erred in finding that she experienced medical improvement as of May 6, 2015. The Court disagrees on both points.

First, the ALJ explicitly described and followed the eight-step sequential medical improvement evaluation procedure. (R. 736-37, 752, 754-59). At step one, the ALJ determined that Chestine had not engaged in substantial gainful activity at any time since her alleged onset date of June 3, 2010. *Id*. at 737. At step two, the ALJ next found that Chestine's impairments did not meet or equal a listing beginning on May 6, 2015. *Id.* at 752, 754. At step three, the ALJ found that medical improvement occurred as of May 6, 2015. *Id*. at 754. At step four, the ALJ determine that the medical improvement was related to the ability to work because Chestine no longer equaled the severity of a listing. *Id*. The ALJ properly skipped step five because she found that Chestine had experienced medical improvement. *See* 20 C.F.R. § 404.1594(f)(5). At step six, the ALJ found that Chestine had not developed any new severe impairment or impairments since May 6, 2015. (R. 754). Thus, the ALJ found that Chestine's current severe impairments were the same as those present from June 3, 2010 through May 5, 2015. *Id*. At step seven, the ALJ assessed Chestine's RFC and found that she was capable of performing light work except she could never climb ladders, ropes, or scaffolds and she could perform no more than frequent reaching in all directions, handling, and fingering. *Id*. at 754-55. The ALJ also found that Chestine was able to perform her past relevant work as an assistant manager and thus, her disability ended May 5, 2015. *Id*. at 754-59. Based on this finding, the ALJ did not need to proceed to step eight. 20 C.F.R. § 404.1594(f)(7). Thus, the ALJ properly followed the eight-step process set forth in 20 C.F.R. § 404.1594.

Second, substantial evidence supports the ALJ's finding at step three of the eight-step analysis that medical improvement occurred as of May 6, 2015. The fact that Chestine would no longer need to miss two days of work due to each epidural steroid injection was the primary basis for the ALJ's decision that medical improvement had occurred in Chestine's physical impairments as of May 6, 2015. (R. 754). In her second decision, the ALJ found Chestine disabled from August 14, 2013 through May 5, 2015 based explicitly on Dr. Jilhewar's testimony. *Id*. at 752. As the ALJ noted, Dr. Jilhewar testified that during this period, "ongoing steroid injections into the claimant's spine would result in her being absent from work greater than one day per month and thus the ongoing medical impact of such treatment would be of sufficient severity to medically equal Listing 1.04(A)." *Id*. at 752, 854-55. The ALJ concluded that as of May 6, 2015, Chestine's ability to sustain work activity was no longer impeded by the ongoing need for treatment via epidural steroid injections. *Id*. at 754. Most significantly, the ALJ relied on the opinion of Dr. Jilhewar that Chestine did not meet Listing 1.04 during the period after May 5, 2015 because she was no longer receiving epidural steroid injections. *Id*. at 752, 754. This evidence substantially supports the ALJ's conclusion that Chestine's ability to work was no longer impacted by an ongoing need for epidural steroid injections.

Chestine argues that the record does not demonstrate a decrease in symptoms relating to her back as of May 6, 2015. She contends that the evidence of record fails to support a finding of medical improvement because the physical therapy records, a chiropractor note, and her testimony show that she continues to suffer shoulder, back, and neck pain. Doc. 30-1 at 5. Chestine asserts that "[i]n fact, the evidence of record demonstrates that [her] symptoms worsened following her April 2015 auto crash." *Id*. The ALJ cited to the evidence referred to by Chestine, indicating that it was considered, but the ALJ reasonably found that she was not as limited as she claimed.

The ALJ expressly considered evidence pertaining to her alleged worsening condition after her car accident in April 2015. The ALJ noted that Chestine experienced a "brief exacerbation of symptomology after a motor vehicle accident in mid-April 2015." (R. 755). However, as the ALJ further noted, imaging of Chestine's thoracic and cervical spine five days after the accident noted no evidence of acute injury and only previously seen mild degenerative changes. *Id.*; *see also id*. at 1493 (4/24/2015—"No CT evidence of acute cervical spine injury and mild C5-C6 spondylosis."); *id*. at 1494 (4/24/2015—"Thoracic vertebral alignment and vertebral body heights are maintained. Paraspinal lines are maintained. There is mild narrowing at the mid thoracic disc spaces with mild osteophytosis. No radiographic evidence of acute thoracic spine injury."). The ALJ noted that upon examination, Chestine's range-of-motion of her back was normal, her strength and sensory function were normal, and she had no focal neurological deficits. *Id*. at 755, 1492. The ALJ also noted that Chestine was tender along the thoracic spine. *Id*. Chestine was diagnosed with neck strain and strain of the thoracic region, and she was prescribed anti-inflammatory and pain medications and a muscle relaxant and given instructions for back exercises at home. *Id* at 755, 1495, 1498-99. As the ALJ noted, the instructions on home back exercises directed: "not avoid exercise or work" because the "body is made to move," "[i]t is not dangerous to be active, even though your back may hurt," and "[y]our back will likely heal faster if you return to being active before your pain is gone." *Id*. at 755, 1500.

The ALJ also relied on physical therapy records showing that the motor vehicle accident in April 2015 only briefly exacerbated Chestine's symptoms. At her initial May 19, 2015 physical therapy evaluation after her car accident, Chestine reported 8/10 pain in the cervical-thoracic spine that radiates into the left upper trapezius, left upper arm and left forearm. (R. 1193). Chestine had 5/5 strength throughout both upper extremities except for grip strength. *Id*. Her grip strength

measured 35, 35, 20, 35, and 40 psi in her right hand and 15, 25, 15, 20, and 30 psi in her left hand. *Id*. The therapist "did not detect abnormal neurological tests" and found Chestine's clinical presentation "consistent with soft tissue pain, and postural deficits." *Id*. at 755, 1194. The ALJ noted that the therapist indicated that Chestine's neck disability index score "suggest[ed] crippled status, which does not correlate with her ability to dress herself, maintain basic ADLs, and drive herself to the clinic today." *Id*. The ALJ accurately described the physical therapist's objective findings, noting that Chestine's gait was not abnormal, her posture was poor but she was able to correct it with verbal cueing, and her neck range-of-motion was diminished by fifty percent in extension and bilateral rotation but there was only minimal loss of bilateral flexion and no loss of forward flexion. *Id*. at 755, 1193. Finally, the ALJ noted that although Chestine's grip strength measures were diminished in the left upper extremity as compared to the right, strength in her bilateral upper extremities globally was intact at five out of five and the therapist noted that Chestine's grip strength measures "could suggest lack of effort." *Id*. at 755, 1193-94. As mentioned by the ALJ, a physical therapy discharge report on August 26, 2016 noted that Chestine had "made improvements during the course of physical therapy," including "strength gain in her scapular stabilizing muscles" and lower extremities and moderate improvement in her reported pain scores. *Id*. at 756, 1375.

The ALJ next noted that aside from medication management, the extent of Chestine's treatment for her spinal and shoulder impairments in 2016 consisted of chiropractic care and physical therapy. (R. 756). The ALJ correctly noted that Chestine's improvement with physical therapy was consistent with her reports of improvement to her chiropractor, Dr. Jermaine Burney, D.C., on September 3, 2016 that her "lower back pain has reduced" and her neck and shoulder pain feels "better." *Id*. at 756, 1408. As the ALJ noted, on August 27, 2016, Chestine told her

chiropractor that she was "able to walk for longer periods of time." *Id*. at 756, 1406. The ALJ further noted Chestine's lumbar range of motion was initially limited, but her core strength and neck range of motion consistently improved and by September 2016, her lumbar spine range of motion was improving as well. *Id*. at 757, 1406, 1408. In the second-to-last chiropractor treatment note on November 21, 2016, Dr. Burney wrote that Chestine was experiencing lower back pain only "on and off" and "was able to walk for an extended period of time." *Id*. at 757, 1422.

Also key to the ALJ's finding of medical improvement were the records of her treating physician, Dr. Jason Griffin. (R. 755-56). The ALJ found that Chestine's physical therapy records were generally consistent with the records of Dr. Griffin. *Id*. In support of this finding, the ALJ noted Dr. Griffin's findings from May 21, 2015 that her motor vehicle accident aggravated Chestine's neck pain but she was still sleeping "better" with Trazodone, six to seven hours per night. *Id*. at 755-56, 1957. The ALJ also noted that Dr. Griffin's notes indicated that some muscle spasm in the left upper trapezius was present along with tenderness to palpation in the left upper lumbar region, but straight-leg testing remained negative, there were no assessed upper or lower extremity motor deficits and aside from a temporary prescription for Norco that Dr. Griffin refused to renew, Chestine's treatment otherwise remained conservative, consisting of physical therapy along with Ibuprofen, Tramadol, and Flexeril (muscle relaxant). *Id*. at 756, 1959-60. The ALJ reasonably relied on Chestine's conservative treatment and did not err by viewing Chestine's conservative treatment as inconsistent with pain so severe that it rendered her unable to work. *Anthony G. v. Saul*, 2020 WL 439964, at *10 (N.D. Ill. Jan. 28, 2020) ("[T]he Seventh Circuit has held that it is reasonable for an ALJ to consider a claimant's conservative treatment."); *Olsen v. Colvin*, 551 Fed. Appx. 868, 875 (7th Cir. 2014) (noting that "the epidural steroid injections were

the most invasive treatment [the claimant] received for her back pain, and those injections have been characterized as 'conservative treatment.'").

Further, the ALJ noted Dr. Griffin found no motor deficits in Chestine's upper and lower extremities during physical exams in June and August 2015. (R. 756, 1964, 1970). While muscle spasm in the left upper trapezius was noted along with tenderness to palpation and her left back was tender to palpation in the upper lumbar area, Chestine had "[f]ull range of motion of the shoulder" at her August 7, 2015 appointment. *Id.* As the ALJ noted, Dr. Griffin continued Chestine on Tramadol and Ibuprofen, but he "told [Chestine] that her thoracic and cervical MRI [scans] look[ed] good and she should be function[ing] with less pain." *Id.* at 756, 1965, 1971. Dr. Griffin's notes indicate that an MRI of Chestine's left shoulder on July 17, 2015 showed "mild supraspinatus tendinosis and a high signal in the anterior superior labrum there is a cyst on the glenoid." *Id.* at 1970, 1975. Dr. Griffin suggested that Chestine "should do more exercise and [a] home exercise program." *Id.* at 756, 1971. The ALJ wrote that Dr. Griffin opined that he was "not sure that all of her pain [wa]s degenerative in nature" and he felt "her psychological problems contribute." *Id.* at 765, 1966, 1972. The ALJ next noted that in October 2015, Dr. Griffin made similar statements that he was "not sure that all of her pain [wa]s degenerative in nature." *Id.* at 756, 1977. Dr. Griffin felt that "psychological problems contribute" to Chestine's chronic pain, including stress from a divorce and past abuse by her husband. *Id.* at 1977. No prescriptions were requested or ordered during the October 2015 visit with Dr. Griffin. *Id.* Dr. Griffin suggested that Chestine try to wean off "other meds in [the] future" and "consider psychiatrist/psychologist in [the] future." *Id.* at 756, 1977. Finally, Dr. Griffin indicated that he could see Chestine in the next month if she gets sick or needs medication, but he directed her to find a new primary care physician who can coordinate her care. *Id.* at 1977. He wrote: "I am not really helping her—just refilling her meds." *Id.*

Chestine also contends that the ALJ's finding of medical improvement does not adequately account for her persistent pain and the decline in her ability to walk. Doc. 30-1 at 4-5. At the hearing on November 16, 2017, Chestine testified that she was walking two to three miles a day and two miles at a time. (R. 788). The ALJ found Chestine's testimony about the extent of her walking ability consistent with the medical evidence in the record. *Id.* at 757. In making that determination, the ALJ relied on Chestine's reports to her chiropractor that she was "able to walk for longer periods of time" and she "was able to walk for an extended period of time." *Id.* at 756-57. Although Chestine testified to a reduced walking distance, she has not shown that her ability to walk two to three miles a day is inconsistent with the ALJ's RFC. Moreover, the treatment records during the time period after May 5, 2015 do not note impairments in Chestine's gait or identify any express limitations on Chestine's ability to walk. Indeed, in 2015, Dr. Griffin advised Chestine to walk and get more exercise. *Id.* at 756, 1966, 1971-72, 1976, 1977.

As the Commissioner argues, the fact that Chestine continues to suffer some pain does not necessarily disprove that medical improvement occurred as of May 6, 2015. *See Blevins v. Astrue*, 451 Fed. Appx. 583, 585 (7th Cir. 2011) (ALJ's finding of medical improvement supported by substantial evidence where claimant's GAF score decreased from the range of serious to moderate symptoms or difficulty in functioning); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989); *Maudlin v. Astrue*, 2015 WL 5212049, at *5 (S.D. Ohio, Sept. 8, 2015) ("'Medical improvement' is not synonymous with 'full recovery.'"); *Crowell v. Astrue*, 2011 WL 4863537, at *5 (S.D. N.Y. Oct. 12, 2011) (the persistence of "illnesses and complications is not inconsistent with a finding of medical improvement" because "[t]he medical improvement standard does not require that a claimant experience a full or even substantial recovery."). Significantly, the ALJ did not find that Chestine is pain free; rather, she found that Chestine's "orthopedic function improved and her

levels of reported pain decreased" with physical therapy and chiropractic care. (R. 758). The ALJ further found that "given the dearth of evidence of significant evidence and persistent limitation in function with regard to strength, manipulation, sustained sitting, standing, or ambulating, and spinal range-of-motion," Chestine retained the RFC to perform a range of light work. *Id.* at 757. Chestine does not dispute the ALJ's observation that there was no evidence of motor deficits in the upper and lower extremities and that her gait was normal and she had full range of motion of the left shoulder. The ALJ accepted that Chestine was not symptom-free and accommodated her complaints of neck, back, and shoulder pain by restricting her to no climbing of ladders, ropes, or scaffolds and no more than frequent reaching in all directions, handling, and fingering. *Id.* Chestine does not specifically challenge any aspect of the ALJ's subjective symptom analysis.

Chestine asserts that the ALJ improperly determined that she no longer needed the injections after May 5, 2015 because her pain persisted. Doc. 43 at 2-3. Substantial evidence supports the ALJ's conclusion that Chestine's "levels of reported pain decreased" after May 2015 and thus, she no longer needed to miss an excessive number of days of work due to epidural steroid injections. (R. 758). Looking to the record, Dr. Jilhewar cited treatment notes showing that Chestine reported some improvement in pain after her lumbar spine injection series. *Id.* at 842-43; *id.* at 1848 (9/5/2013—reporting "moderate relief"); *id.* at 1850 (9/5/2013—"25% relief with initial LESI"); *id.* at 1857 (9/27/2013—able to complete all activities of daily living); *id.* at 1861 (lower back pain is improved; attributes it to initial injection); *id.* at 1863 (9/27/2013—advised to continue normal activities as tolerated and advised against any form of bedrest); *id.* at 1870 (10/22/2013—third lumbar injection yielded 25 to 30 percent "sustained" relief ); *id.* at 1872 (10/22/2013) (advised to continue normal activities as tolerated and advised against any form of bedrest). Further, Dr. Jilhewar cited treatment notes indicating that later cervical injections also

provided some improvement in pain. *Id*. at 843; *id*. at 1906 (5/22/2014—first cervical injection resulted in 50% reduction of pain). The ALJ also relied on physical therapy notes indicating that Chestine made improvements through physical therapy in 2016 and treatment notes in 2016 showing improved lumbar range of motion. *Id*. at 756-757. Overall, the record adequately supports the ALJ's conclusion that Chestine's failure to pursue additional injections suggests that her back pain decreased after May 5, 2015 and that her back pain was not as debilitating as she alleged.

Chestine suggests that the absence of additional injections for her back pain was due to a lack of insurance. Doc. 43 at 3. Even accepting Chestine's testimony that she had insurance coverage issues, the record does not demonstrate that she would need excessive absences from work if she had insurance coverage. Chestine cites her testimony that she has not received any medical treatment for cysts which she noticed in late 2016 because of "problems right now with [her] insurance." (R. 805). This testimony does not show that the ALJ's decision with respect to medical improvement due to lack of excessive work absences is not supported by substantial evidence. Chestine does not establish the type of treatment she would receive for her cysts if she had insurance and that such treatment would necessarily result in work absences. Setting aside the insurance issue, Chestine testified that she receives three cervical injections a year which last between four to six months and that her last cervical injection was in July or August 2017. *Id* at 809. Dr. Jilhewar testified that Chestine would be unable to work two days with each injection. *Id*. at 8534. Three cervical injections a year amounts to six missed days of work and would not exceed employer tolerances for absences, which is 12 to 18 days per year. *Id*. at 854, 875.[2]

---

[2]     On May 22, 2014, Chestine's pain physician suggested no further lumbar injections, and Chestine points to no evidence otherwise. (R. at 1906).

Finally, Chestine argues that "[i]n finding medical improvement, the ALJ simply stated that there was no new imaging illustrating [her] pain and that she 'ultimately improved' with physical therapy." Doc. 30-1 at 5. As an initial matter, Chestine's argument misstates the ALJ's findings. The ALJ did not find that there was no new imaging "illustrating her pain." Rather, the ALJ properly considered the degree to which the objective medical evidence supported a finding that Chestine met or equaled Listing 1.04. Chestine cites no medical evidence to prove that she meets or medically equals Listing 1.04(A). *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing.").

The ALJ found that beginning May 6, 2015, Chestine did not meet Listing 1.04 (disorders of the spine) because "there is no evidence of spinal arachnoiditis or any new imaging indicating significant central canal stenosis." (R. 754). Substantial evidence supports the ALJ's finding in this regard. *Id.*; *see also id.* at 1975 (10/25/2015 – Dr. Griffin stating that "[t]he MRI of her thoracic spine was unremarkable as well as the MRI of her cervical spine[.] [A]ll of these were done in May 2015."). In finding that beginning May 6, 2015, Chestine did not meet Listing 1.04, the ALJ also noted that "there is no atrophy, straight-leg raise testing is always negative, strength is repeatedly assessed as intact in the upper extremities and though initially diminished minimally at four-minus of five in the lower extremities, ultimately improved with physical therapy, with notes of 'normal motor' function and '[n]o focal neurovascular deficits' as of late-November 2016." *Id.* at 754. The ALJ further noted that Chestine's "gait is consistently normal and as of the most recent objective medical evidence from late-November 2016 and mid-July 2017, [she] was 'able to walk for an extended period of time' and do so 'without any problem' and a 'normal' gait pattern." *Id.* Substantial evidence in the record supports each of these findings. *Id.* at 1959 (5/21/2015 – Dr.

Griffin noting negative straight leg raising and no motor deficits in upper or lower extremities); *id*. at 1964 (6/10/2015—Dr. Griffin noting negative straight leg raising and no motor deficits in upper or lower extremities); *id*. at 1970 (8/7/2015—Dr. Griffin noting negative straight leg raising and no motor deficits in upper or lower extremities); *id*. at 1241 (6/21/2016—physical therapy initial assessment indicating strength below hips were at 4- to 4/5); *id*. at. 1375-76 (8/26/2016—physical therapy discharge report stating Chestine "has made some improvements during the course of physical therapy," "[s]he has gained lower extremity strength," and "[s]trength in the lower extremities . . . []is within functional limits."); *id*. at 1422 (11/21/2016 – Chestine reported to chiropractor that "[s]he was able to walk for an extended period of time."); *id*. at 1718-19 (11/21/2016—Silver Cross Hospital Emergency Department record noting "[n]o focal neurovascular deficit," "[p]atient is able to walk around without any problem," and "normal motor function observed"); *id*. at 1462 (7/18/2017—Advocate Medical Group office treatment records noting "normal gait"). The ALJ also reasonably relied on the medical expert's opinion when concluding that Chestine does not meet Listing 1.04 during period beginning May 6, 2015. (R. 754, 855); *Schoenfeld v. Colvin*, 2016 WL 878263, at *3 (N.D. Ill. March 8, 2016) ("ALJ properly relied on the testimony of the ME as to whether the evidence supported a finding that [the claimant] met or equaled any listed impairment."). As discussed below, the ALJ did not err when evaluating Dr. Jilhewar's opinion.

**B.** **Post-May 5, 2015 RFC Determination**

Chestine next argues that ALJ improperly found that beginning May 6, 2015, she retained the RFC to perform a range of light work. Doc. 30-1 at 6. She contends that the RFC, after the date of medical improvement was found and at step seven, is not supported by substantial evidence

because the ALJ should have determined that there would be limitations with respect to off-task behavior, changing positions, and the need for work absences.

Chestine first challenges the RFC assessment as flawed because the ALJ inadequately accounted for her inability to focus on a task 85% of the time. Doc. 30-1 at 6. The VE testified that no jobs are available for someone who is off-task more than 15 percent of the day. (R. 875). The ALJ found that Chestine's pain did not "significantly impact[] [her] memory, attention or concentration" during the period since May 6, 2015. The ALJ identified substantial evidence in the record to support her finding that Chestine's concentration is only mildly limited. *Id*. at 743. Specifically, the ALJ noted that consulting psychologist Kelly Renzi found, after evaluating Chestine in June 2012, that her "memory and concentration were mildly below average but not significantly impaired." *Id*. at 366, 743. Further, the ALJ considered evidence from Chestine's Function Report, noting that she was able to persist in performing more complex daily activities such as managing her finances and shopping for food. *Id*. at 246, 742. The ALJ acknowledged that Chestine noted some difficulty following spoken instructions but noted that she did not indicate any issues regarding following written instructions or finishing tasks she started. *Id*. at 248, 742. Moreover, treatment notes in November 2016 and July 2017 noted no difficulty with attention or concentration. *Id*. at 757, 1462, 1719. The ALJ's finding that Chestine suffered from only mild impairment in her ability to concentrate is therefore supported by substantial evidence. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) ("[T]he ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record.").

Chestine points generally to Dr. Griffin's treatment records and the records of the physical therapists as well her own testimony as evidence that she would be off task for more than 15% of the time. Doc. 30-1 at 6. As explained below, the record supports the ALJ's decision to give "little

weight" to Dr. Griffin's May 21, 2015 opinion that Chestine would be off-task from 25% or more of the workday because it was not consistent with the objective medical evidence and inconsistent with his own treatment notes. (R. 758, 1175). The ALJ correctly noted that the record indicates that that Dr. Griffin's office repeatedly found that Chestine's concentration and attention span were normal. *Id*. at 743, 1844, 1847, 1850, 1858, 1862, 1866, 1871, 1875, 1901, 1905, 1917, 1924, 1947.

Moreover, the ALJ explicitly recognized that Chestine's concentration level may have briefly diminished during her summer 2016 physical therapy sessions but found that ultimately, she was able to participate in her exercise program and her increased difficulty with concentration did not persist. (R. 743). For example, the ALJ noted that during Chestine's initial physical therapy assessment on June 21, 2016, she "had difficulty focusing on one task/area at a time" and was "at times difficult to redirect and seemed angered by attempts to do so." *Id*. at 743, 1240. When Chestine attended her June 30, 2016 physical therapy session, she "needed multiple verbal cues to return to the immediate task of 'core strengthening.'" *Id*. at 1274. However, the ALJ correctly noted that by July 13, 2016, Chestine responded well to her therapy session and needed "minimal cuing" to correct her form. *Id*. at 743, 1296. The physical therapist observed, and the ALJ noted, that Chestine was "continuing to show progression by performing increasingly complex exercise movement." *Id*. Similarly, on July 22, 2016, Chestine's physical therapist noted that "[d]espite her high pain rating she has continued to be able to participate in her exercise program." *Id*. at. 1319; *see also id*. at 1329 (8/5/2016—"[i]ncreased the intensity of some of her exercises which [she] tolerated well); *id*. at 1342 (8/12/2016) ("she has tolerated all of her exercises fairly well to this point."); *id*. at 1351 (8/16/2016) ("continues to improve in her performance of the exercises."). At time of her discharge from physical therapy on August 26, 2016, Chestine had "made

improvement during the course of physical therapy," including a moderate improvement in her reported pain levels over the last few sessions. *Id.* at 1375. Given this record and the reasons cited by the ALJ, the ALJ did not err in finding that beyond the brief episode at the beginning of her physical therapy sessions, the subsequent medical records do not support the "need for accommodation or redirection or refocusing of [Chestine's] attention" and "the longitudinal record does not reflect such a significant level of difficulty with concentration as was noted in the physical therapy records from the summer of 2016." *Id.* at 743.

Regarding Chestine's own testimony, the ALJ noted that Chestine testified that her pain limits her ability to focus. (R. 755, 826-28). Nevertheless, the ALJ was not required to accept Chestine's testimony if it was not consistent with the other evidence and Chestine does not challenge the ALJ's finding that her testimony about the extent of her symptoms was not completely credible. *Elder v. Berryhill*, 774 Fed. Appx. 980, 983 (7th Cir. 2019) ("[A]n ALJ may discount an applicant's testimony if . . . other evidence in the record provides a basis for doing so."); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("Because the ALJ found Sienkiewicz not entirely credible, he was not required to accept in its entirely her testimony about her potential need for unscheduled breaks."). For all these reasons, the ALJ's decision not to adopt a limitation that Chestine would be off-task for more than 15% of the workday is supported by substantial evidence.

Second, Chestine asserts that the ALJ failed to properly account for her need to change positions every 30 to 60 minutes because of pain. The only evidence Chestine cites in support is her own testimony, which the ALJ found to be only partially credible. Doc. 30-1 at 6; (R. 825). The ALJ noted that Chestine alleged that she needed to shift positions or take breaks and lie down in bed or a recliner but found that the Chestine's "response to continued conservative treatment

and the dearth of evidence of significant and persistent limitation in function with regard to . . . sustained sitting, standing, or ambulating, and spinal range-of-motion" justified a range of light work RFC without a sit/stand limitation. (R. 755, 757). Again, Chestine does not argue that the ALJ erred in her assessment of Chestine's subjective complaints. The ALJ also noted that Chestine reported in August 2015 that when "[d]riving longer distances she notices more pain" in her lower back or buttocks, but Chestine did not assert that such level of pain prevented her from "sustaining this activity or failing to accomplish it." *Id*. at 756, 1968. In evaluating her need to change positions, the ALJ was not required to include into the RFC limitations that she did not find to be credible. *Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011).

Although not cited by Chestine in support of her argument, Dr. Griffin opined in May 2015 that Chestine needed a job that permits shifting positions at will from sitting, standing, or walking and needed to take unscheduled breaks twice a day for 15 minutes. (R. 1173). As discussed below, the ALJ did not err in giving little weight to Dr. Griffin's May 21, 2015 opinion. Because the ALJ properly discredited Dr. Griffin's May 2015 opinion, the ALJ was not required to include a sit/stand option in the RFC. *Holmes v. Berryhill*, 2017 WL 5891057, at *8 (N.D. Ill. Nov. 29, 2017) (Because "the ALJ's reasons for discounting [claimant's primary care physician's] opinions are supported by substantial evidence, the ALJ was not required to include those limitations in his RFC determination.").

Third, Chestine contends that the ALJ failed to properly assess whether her need for excessive work absences caused by her primary care physician appointments and physical therapy and chiropractic treatments would impact her ability to work. The "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 98-6 p, 1996 WL 374184, at *1 (July 2, 1996); *see also*

20 C.F.R. § 404.1545(b). A "regular and continuing" basis means the ability to work "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1. Repeated absences from work for medical reasons could disqualify a person from sustaining gainful employment. *Voigt .v Colvin*, 781 F.3d 871, 874 (7th Cir. 2015) ("To miss four workdays a month would reduce one's average workweek from five to four days, which would not constitute working on a sustained basis as defined by the Commission."). Moreover, an ALJ may "be obligated to address a claimant's ability to sustain work, if the claimant presents sufficient evidence demonstrating that the ability would be precluded by treatment visits which are necessitated by the claimant's impairments." *Gary B. v. Berryhill*, 2018 WLJ 4907495, at *4 (S.D. Ind. Oct. 10, 2018). "Necessary visits may preclude sustaining work if they are too frequent or otherwise cannot be scheduled around a full-time competitive schedule, including if those visits regularly occur on an emergency or otherwise unpredictable basis." *Id*. Finally, "[r]estrictions on a claimant's ability to sustain full-time work, due to the frequency of appointments, would fall within the analysis of her RFC on which she maintains the burden of proof." *Bray v. Commissioner of Social Sec.*, 2014 WL 4377771, at *2 (S.D. Ohio Sept. 3, 2014); *Weaver v. Berryhill*, 746 Fed. Appx. 574, 579 (7th Cir. Aug. 20, 2018) (claimant bears the burden of providing evidence supporting "specific limitations affecting her capacity to work").

The district court's remand order instructed the ALJ to analyze "whether Plaintiff has established that she will be consistently absent from work for medical reasons for a certain number of days per month." (R. 913). In his May 2015 Physical Medical Source Statement, Dr. Griffin opined that Chestine would likely be absent from work more than four days per month as a result of her impairments or treatment. *Id*. at 1175. At the hearing on remand, Chestine testified in a conclusory manner that she was unable to get a job due to absenteeism, and the VE was ask about

the impact of absences on Chestine's ability to work. *Id.* at 813, 874-75. The VE confirmed that if Chestine were absent in excess of 12 to 18 days per year, she would not be able to maintain work on a full-time basis. *Id.* at 875.

The ALJ adequately addressed Chestine's claim that she is unable to work due to absenteeism and the opinion evidence related to this issue in the context of the RFC analysis. Contrary to Chestine's contention that "the ALJ never really determined that [her] medical appointments, including physical therapy and chiropractic treatments, did and would require her to miss more work than an employer would allow," the ALJ's review of the post-May 5, 2015 evidence led her to conclude that "evidence of sustained improvement despite a dearth of ongoing treatment directly contradict[ed]" Chestine's assertion that she required "repeated and ongoing frequent doctor visits which would render her repetitiously absent from work." Doc. 30-1 at 7. The ALJ also found that the evidence of record did not support a "need for recurrent absences" during the time period prior to August 14, 2013. (R. 747). The ALJ relied on Dr. Jilhewar's testimony that the series of injections Chestine received during the time period from August 14, 2013 through May 5, 2015 would have resulted in her being absent from work greater than one day per month and thus, the ongoing impact of such treatment was temporarily of sufficient severity to medically equal Listing 1.04(A). *Id.* at 752. The ALJ acknowledged Dr. Griffin's assessment that Chestine would likely be absent from work more than four days per month, but as explained below, the ALJ properly gave little weight to this opinion. *Id.* at 758.

In essence, Chestine argues that her medical appointments necessitated that she would consistently be absent from work more than 12-18 days per year, but she has not met her burden to show that her primary care physician appointments and physical therapy and chiropractor treatments preclude her from working. Putting aside the ALJ's appropriate rejection of Dr.

Griffin's finding that Chestine would likely miss more than four days of work per month, Chestine did not identify any evidence demonstrating that medical appointments would interfere with a full-time retail position and that she would be unable to schedule those routine appointments during non-working hours. *Best v. Berryhill*, 730 Fed. Appx. 380, 382 (7th Cir. July 11, 2018) (characterizing claimant's contention that the ALJ erred in failing to account for the fact that he would have to miss work more often than employers tolerate to attend four doctors' appointments each month as "frivolous" where the claimant did not "point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours."). Chestine points to no evidence demonstrating that her treatment appointments must occur during work hours and cannot be arranged around a retail work schedule. *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) ("Plaintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty . . in that it assumes she was required to miss entire days for each appointment.").

In support of her argument, Chestine claims, without citation to the record, that "evidence adduced at the November 16, 2017 hearing indicates that there is a substantial likelihood that [she] would be unable to find gainful employment due to excessive absence starting in June 2010." Doc. 30-1 at 7. But Chestine makes no effort to explain how long the appointments lasted or even whether they could occur during hours when she would be working. Because Chestine has not shown that the extent and nature of her treatment, which consists of regular and predictable primary care physician appointments and physical therapy and chiropractor sessions, would only be able to occur during working hours or that the appointments could not be arranged around a full-time retail position schedule by scheduling them prior to work, after work, or on a non-work day or over a lunch hour to avoid missing work, the ALJ's rejection of Chestine's claim of excessive

absenteeism is supported by substantial evidence.  *Donielle H. v. Berryhill*, 2019 WL 1614640, at *4 (S.D. Ind. Apr. 15, 2019) (holding that the plaintiff "did not present any evidence that the necessary treatment needed to occur during working hours or could not have been schedule around a full-time work schedule" where plaintiff argued that treatment two to three times per month involving individual therapy sessions lasting forty to fifty minutes each and medication management visits with a psychiatrist lasting fifteen minutes precluded her from sustaining full-time work); *Pryor v. Commissioner of Social Security*, 2015  WL 12683977, at *7 (E.D. Mich. Aug. 21, 2015) ("Pryor has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule.  The claimant is tasked with providing evidence in support of his alleged disability."), *report and recommendation adopted*, 2015 WL 6735336 (E.D. Mich. Nov. 4, 2015).

Chestine takes issue with Dr. Jilhewar's testimony that her visits to other treatment providers besides the pain clinic for her epidural steroid injections would not result in absences impacting her ability to work. (R. 870).  Dr. Jilhewar reasoned that he schedules his own doctor's appointments on Saturdays. *Id*.  Chestine claims that Dr. Jilhewar is unqualified to provide this opinion.  Regardless of Dr. Jilhewar's qualifications to provide this opinion, it is inconsequential because the ALJ did not rely on Dr. Jilhewar's testimony in this regard as a basis for rejecting Chestine's claim of excessive absences.  Moreover, Dr. Jilhewar's reasoning is correct that nothing in the record suggests that Chestine's regular primary care physician, physical therapy, and chiropractor appointments would require her to miss a full day of work or that she could not schedule these appointments outside of working hours. *Best*, 730 Fed. Appx. at 382.

Chestine also faults the ALJ for failing to ask the VE about "scheduling difficulties for those in retail positions." Doc. 30-1 at 7.  Because the ALJ was only required to ask the VE about

"those impairments and limitations that [s]he accepts as credible" and the ALJ found Chestine's claim of excessive absences due to her regular medical appointments not credible, the ALJ was not required to ask the VE this. *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Moreover, Chestine was represented by counsel during the second hearing, and her counsel could have asked the VE about scheduling issues in retail positions. It was Chestine's burden to show that her appointments necessarily conflict with a full-time work schedule, and the ALJ was entitled to assume that Chestine, represented by counsel, made her strongest case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) ("a claimant represented by counsel is presumed to have made his best case before the ALJ."). Therefore, the ALJ did not error in failing to ask the VE about "scheduling difficulties" in retail positions.

## C.    Medical Opinion Evidence

Chestine asserts that the ALJ improperly weighed the medical opinion evidence by failing to accord more weight to the opinion of her treating physician Dr. Griffin instead of relying on ME Jilhewar's opinion. The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record."). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship,

frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c).

Chestine argues that the ALJ erred in failing to give Dr. Griffin's opinion controlling weight and incorrectly assessed the relevant factors in assigning his opinion "little weight." (R. 758). Dr. Griffin had treated Chestine since 2010 and opined in May 2015 that Chestine: is unable to sit more than five minutes at a time and stand more than 10 minutes at a time; can sit and stand/walk less than two hours in an 8-hour work day; must be permitted to shift positions at will from sitting, standing, or walking; needs to walk around every 10 minutes for two minutes; must take unscheduled breaks twice a day for 15 minutes; can rarely lift less than 10 pounds, twist, stoop, crouch, climb stairs and ladders; has significant limitations with reaching, handling or fingering; will likely be off task 25% or more of a workday because pain interferes with attention and concentration; is incapable of even "low stress" work; and will miss more than four days per month as a result of her impairments or treatment. *Id.* at 1173-75.

The ALJ articulated good reasons for assigning little weight to Dr. Griffin's May 2015 opinion. The ALJ reasonably determined that Dr. Griffin's opinion that Chestine was "incapable of sustaining even sedentary work which would permit shifting positions at will, being off-task more than 25 percent of the day, and being absent more than four days per month" was "not consistent with the objective medical evidence during this period including Dr. Griffin's own treatment notes." (R. 758). The ALJ's decision thoroughly reviewed Chestine's medical history including Dr. Griffin's records and found a "dearth of evidence of significant and persistent limitation in function with regard to strength, manipulation, sustained sitting, standing, or ambulating, and spinal range-of-motion." *Id.* at 757. For the period prior to August 14, 2013, the

ALJ assigned little weight to Dr. Griffin's May 2015 opinion because it was made subsequent to the period in question and was "wildly excessive" when compared to the objective finding during the referenced period. *Id*. at 751. The ALJ explained that "what the record does indicate is that in the presence of appropriate treatment, namely the claimant's physical therapy and chiropractic care, her orthopedic function consistently improved and her levels of pain decreased" and Dr. Griffin's opinion "was not consistent with the longitudinal record subsequent to the end of the claimant's period of disability in early-May 2015." *Id*. at 758.

For example, the ALJ noted that Dr. Griffin's records in the later months of 2010 and in the later months of 2011 through August 2013 consistently reflect no motor or sensory deficits on examination and that she walked between five or more miles on a daily basis "without pain" except for a brief episode of increased hip pain in March 2013 which did not persist. (R. at 739). The ALJ also noted that more recent evidence since 2015 reflected that Chestine consistently ambulated with an unremarkable gait pattern and while her bilateral hip strength was minimally reduced at four-minus to four of five in April 2015, she "made improvements during the course of physical therapy," "gained lower extremity strength," and her strength in her lower extremities was within functional limits. *Id*. at 739, 1375-76; *see also id.* at 754 (noting that beginning May 6, 2015, Chestine's gait is consistently normal and the "most recent objective medical evidence from late-November 2016 and mid-July 2017, the claimant was 'able to walk for an extended period of time' and do so "without any problem' and a 'normal' gait pattern"). Further, the ALJ indicated that in June and August 2015, Dr. Griffin noted no motor deficits in the upper and lower extremities and Chestine had full range of motion of her left shoulder. *Id*. at 756. As the ALJ noted, in August 2015, Dr. Griffin told Chestine that "her thoracic and cervical MRI [scans] look[ed] good and she should be [f]unction[ing] with less pain" and "[s]he should do more exercises and [a] home

exercise program." *Id.* at 756, 1971.  In October 2015, Dr. Griffin made similar statements and recommended "exercise walking." *Id.* at 756, 1976-77.  The ALJ also noted that Chestine testified at the November 2017 hearing that she currently walks up to two to three miles a day. *Id.* at 757, 788.  This evidence is inconsistent with Dr. Griffin's opinion that Chestine could only walk two blocks without rest or severe pain and "can't walk long distances now." *Id.* at 1173, 1175.

Similarly, the ALJ noted that Dr. Griffin's records from 2013 through 2015 "repeatedly and consistently" assessed Chestine's concentration and attention span as normal. (R. 743).  Also, the psychological consultative examiner found in June 2012 that Chestine's memory and concentration were "slightly below average but not significantly impaired." *Id.* at 365, 743.  These findings contradict Dr. Griffin's opinion that Chestine would be off-task 25% or more of the typical workday. *Id.* at 1175.  These explanations constitute good reasons for rejecting the extreme limitations in Dr. Griffin's opinion because that opinion conflicted with not only the objective evidence of record but even with Dr. Griffin's own treatment notes and Chestine's testimony. *Henke v. Astrue*, 498 Fed. Appx. 636, 640 (7th Cir. 2012) ("[T]he ALJ did not err or improperly 'play doctor' by examining the medical record and determining that Dr. Preciado's conclusions were unsupported by his own notes or contradicted by other medical evidence."); *Richison v. Astrue*, 462 Fed. Appx. 622, 625(7th Cir. 2012) ("The ALJ did not err here in determining that [the treating podiatrist's] opinion conflicted with the other medical evidence, including his own treatment notes.").

Listing the various diagnoses by Dr. Griffin, Chestine contends that Dr. Griffin's treatment notes are, in fact, consistent with his opinion. Doc. 30-1 at 9.  But diagnoses do not automatically equate to functional limitations caused by those conditions. *Weaver v. Berryhill*, 746 Fed. Appx. at 578-79 (having been diagnosed with certain "impairments does not mean that they imposed

particular restrictions on her ability to work."); *Perez v. Astrue*, 881 F.Supp.2d 916, 945 (N.D. Ill. 2012) ("A diagnoses, or symptom for that matter, does not automatically translate to a limitation or impairment and simply listing them proves nothing."). Chestine must submit evidence establishing "not just the existence of the conditions, but . . . provide evidence that they support specific limitations affecting her capacity to work." *Weaver*, 746 Fed. Appx. at 579. Chestine also cites the fact that her ability to walk declined from seven miles a day to two to three miles a day at the time of the hearing as evidence that the medical record supports Dr. Griffin's opinion. Doc. 30-1 at 9. Again, the Court disagrees. Chestine does not explain how her ability to walk two to three miles a day and for an hour at one time is consistent with Dr. Griffin's opinion that she can only walk two blocks at one time without rest or severe pain and stand for only ten minutes at a time. (R. 788, 1173). Nor does Chestine point to any medical evidence that supports her suggestion that her current ability to walk two to three miles a day and for an hour at a time would preclude her from performing the range of light work provided in the RFC.

Moreover, the ALJ adequately accounted for the factors in 20 C.F.R. § 404.1527(c) when declining to afford Dr. Griffin's opinion controlling weight and instead assigning it little weight. *Chris W. v. Berryhill*, 2018 WL 6305013, at *8 (N.D. Ill. Dec. 3, 2018) (the relevant inquiry is "whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527(c) and built and 'accurate and logical bridge' between the evidence and his conclusion."). The ALJ explicitly noted that Dr. Griffin had treated Chestine since June 2010 and his status as a "treating source." (R. 738, 750). The ALJ noted that Dr. Griffin's opinion "was made with the benefit of an in-person treating relationship and the unique insight gained from that relationship." *Id*. at 758. While the ALJ did not expressly acknowledge Dr. Griffin's specialty in internal medicine, she did consider his May 2015 opinion which indicates his internal medicine specialty. *Id*. at 1175. The ALJ considered

Chestine's five year-long treatment history with Dr. Griffin, noted Dr. Griffin's numerous physical examinations of Chestine during that period, and noted the tests he performed. *Id*. at 738-43, 745-48, 750-51,753-56, 758. The ALJ also considered the consistency and supportability of Dr. Griffin's opinion with the record as a whole. As discussed, Dr. Griffin's opinion was inconsistent with the record because: (1) Chestine's treatment regimen remained conservative consisting of physical therapy, chiropractor care, and Ibuprofen, Tramadol, and Flexeril; (2) medical records revealed muscle spasm in the left upper trapezius along with tenderness to palpation and her left back was tender to palpation in the upper lumbar area but no motor deficits in the upper and lower extremities, normal gait, full range of motion of the left shoulder, and normal concentration and attention span; (3) MRI scans of her thoracic and cervical spine "looked good;" and (4) Chestine's own account of her ability included the ability to walk two to three miles a day and two miles at one time. *Id*. at 1971. Accordingly, the ALJ's decision to afford little weight to Dr. Griffin's May 2015 opinion is supported because the ALJ reasonably found his opinion inconsistent with other substantial evidence in the record, including his own longitudinal treatment record.

In addition, the ALJ properly relied on Dr. Jilhewar's opinion in finding that Chestine could perform a range of light work during the period beginning May 6, 2015 and in rejecting Dr. Griffin's opinion. At the second hearing, Dr. Jilhewar testified that he reviewed the medical records in the file and he listened to Chestine's testimony at the hearing. (R. at 831). After summarizing the medical evidence, for the period beginning on May 6, 2015, Dr. Jilhewar opined that she retained the RFC to perform light physical capacity work with no work involving climbing ladders, ropes, or scaffolds and no more than frequent use of the upper extremities for all functions. *Id*. at 855-56. As to Dr. Griffin's May 2015 opinion that Chestine could sit and stand less than two hours during a workday, Dr. Jilhewar noted "the absence of clinical findings to explain that

restriction." *Id.* at 847. Dr. Jilhewar explained that the record failed to show "clinical findings of motor deficits with a motor strength moderately weak" or "numerous procedures so that the hypothetical person could not function for more than a few hours a day." *Id.* The ALJ assigned "great weight" to Dr. Jilhewar's opinion, noting that it was "consistent with the record as a whole which demonstrates sustained medical improvement directly relating to the claimant's previously disabling impairments throughout this period." *Id.* at 757. In light of Dr. Jilhewar's explanations and their support in the record, the ALJ did not err in crediting Dr. Jilhewar's opinion over Dr. Griffin's opinion. *Fody v. Colvin*, 641 Fed. Appx. 568, 572 (7th Cir. 2016) (the "ALJ adequately explained why she credited Dr. Jilhewar's opinion over [claimant's treating cardiologist's].") ; *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do.").

Further, contrary to Chestine's assertion, the ALJ was not required to recontact Dr. Griffin for clarification "on why . . . his opinion did not match the objective data." Doc. 30-1 at 10. An ALJ may recontact a medical source if she is unable to render a decision because the evidence is insufficient or inconsistent. 20 C.F.R. § 404.1520b(b)(2)(i); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."). "[A]n ALJ need not solicit additional information if she simply finds a physician's opinion unsupported." *Bailey v. Colvin*, 2015 WL 7251939, at *8 (N.D. Ill. Nov. 17, 2015); *Cf. Simila v. Astrue*, 573 F.3d 503, 516-17 (7th Cir. 2009) (finding ALJ did not err in failing to recontact the treating physician where "the ALJ discerned and discussed the evidence upon which [the physician] relied" and "the record was not 'inadequate.' The ALJ simply found that this evidence failed to support [the physician's] conclusions."). Here, the ALJ did not reject Dr. Griffin's opinion because she found the record

inadequate or could not discern the basis for his opinion. Rather, she rejected it because it was inconsistent with the medical evidence, including Dr. Griffin's own examination findings. On the record presented, the ALJ reasonably accepted the opinion from Dr. Jilhewar that Chestine retained the RFC to perform a limited range of light work. Under these circumstances, the evidence received was sufficient for the ALJ to make her RFC determination, and the ALJ did not abuse her discretion in considering Dr. Griffin's opinion without recontacting him. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) ("[H]ow much evidence to gather is a subject on which we generally respect the Secretary's reasoned judgment.").

*Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004), cited by Chestine, does not compel a different result. In *Barnett*, the "the treating physician's treatment notes were consistent with his opinion; the ALJ just improperly disregarded them." *Masek v. Astrue*, 2010 WL 1050293, at *17 (N.D. Ill. March 22, 2010). The Seventh Circuit held that if the ALJ's "real concern as the lack of backup support for [the doctor's] opinion, the ALJ had a mechanism to rectify the problem[:]" "solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett*, 381 F.3d at 669; *see also Simila v.* Astrue, 573 F.3d 503, 516 (7th Cir. 2009) (ALJ need only recontact a medical source if "the medical support is not *readily discernable*." *Id*. (emphasis in original) (quoting *Barnett*, 381 F.3d at 669) (noting "unclear" is tantamount to "not readily discernable."). In contrast, Dr. Griffin's opinion is inconsistent with the medical record and the ALJ did not find the record unclear or inadequate. Given the testimony of Dr. Jilhewar, there was enough evidence in the record to make a disability determination.

## D. VE's Reliance on the DOT

Chestine's last issue with the ALJ's decision is that the ALJ failed to ask the VE about possible conflicts between the VE's testimony and the DOT in accordance with SSR 00-4p.

"Ruling 00-4p requires ALJs to investigate and resolve any apparent conflict between the VE's testimony and the DOT." *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011). "[B]ecause SSR 00-4p imposes an affirmative duty *on the ALJ* to inquire into and resolve apparent conflicts [between the VE's testimony and the DOT], a claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that a violation occurred." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). However, if a claimant's attorney does not identify conflicts at the time of the hearing, then the claimant must show that "the conflicts were obvious enough that the ALJ should have picked up on them without assistance, for SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT." *Id.* "When there is an apparent conflict, ALJs are required to obtain reasonable explanations for the conflict." *Weatherbee*, 649 F.3d at 570.

The VE testified that Chestine's past work included assistant manager, DOT number 195.367-014, and retail manager, store manager, DOT number 185.167-046. (R. 872). The VE further testified that a hypothetical individual with Chestine's background and RFC limitations could perform both jobs as they are normally performed in the national economy. *Id.* at 874. The VE stated that her testimony was consistent with the DOT. *Id.* The ALJ relied on the VE's testimony in finding that Chestine could perform her past relevant work as an assistant manager. *Id.* at 758.

Chestine maintains that two unresolved potential inconsistencies exist here between the VE's testimony and the DOT. She argues that such an inconsistency existed because the jobs identified by the ALJ require capabilities that are beyond her limitations. Doc. 30-1 at 11. In particular, Chestine asserts that the hypothetical question posed to the VE failed to include her difficulty focusing and her need to change positions. *Id.* Chestine's argument in this regard does

not identify an inconsistency between the VE testimony and the DOT. Rather, a challenge to the hypothetical based on an alleged flawed RFC "comes down to whether the ALJ erred in assessing her RFC." *Arnett v. Astrue* 676 F.3d 586, 591 (7th Cir. 2012); *Wurst v. Colvin*, 520 Fed. Appx. 485, 489 (7th Cir. 2013) ("But the hypothetical was based on the ALJ's RFC determination, so [claimant's] objection only repeats his challenge to the RFC."). The ALJ "is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt*, 498 F.3d at 846. As explained above, the ALJ's conclusions regarding Chestine's ability to focus and her alleged need to change positions are supported by substantial evidence. The ALJ incorporated into the hypothetical those impairments and limitations she found credible and supported, which is all that was required.

Second, Chestine challenges the VE's classification of her past relevant work. Chestine argues that the ALJ's reliance on DOT 195.367-014 was improper because it a "management aide" job which "has nothing to do with retail and does not apply to Chestine's work history." Doc. 30.1 at 11. The Commissioner does not explain how the management aid position encompasses Chestine's past retail work. According to the DOT, a "management aid" "aids residents of public and private housing projects and apartments in relocation and provides information concerning regulations, facilities, and services." *See* DOT 195.367-014.[3] Chestine's counsel questioned the VE on cross-examination at the hearing but did not challenge the classification of the assistant manager job. (R. 874-77).

The Commissioner does not dispute that the management aid job, DOT 195.367-014, is an inaccurate classification of Chestine's past work, but he argues that the ALJ did not err in relying

---

[3]     DOT 195.367-014 is available at https://occupationalinfo.org/19/195367014.html (last visited March 10, 2020).

on the VE's testimony because there was no apparent conflict between the VE's testimony and the DOT. A "minor discrepancy between the job title given by a VE and the title listed in the DOT" is insufficient to create an apparent conflict. *Weatherbee*, 649 F.3d at 572. In *Weatherbee*, the Seventh Circuit held that no apparent conflict existed between the VE's testimony and the DOT where the job identified by the VE—"fabrication finisher"—does not exist in the DOT but the similar job of "finisher" which deals with the fabrication of dolls was listed in the DOT and "was clearly the occupational listing that the VE was referring to in her testimony." *Id*. at 571. In this case, the Court is not convinced that the VE's identification of the "management aide" job is a minor discrepancy. It is not clear what job the VE was referring to in her testimony when she identified the "management aide" job. Moreover, if the ALJ had checked the DOT, it would have been clear that the "management aide" job does not deal with retail work. *Collins v. Berryhill*, 743 Fed. Appx. 21, at *25 (7th Cir. 2018) (holding apparent conflict existed between VE's testimony that claimant could find sedentary work as a food preparer and officer help versus the DOT which classified food preparer and officer helper as light work because "it would have been obvious had the ALJ checked the DOT.").

Even if there is a conflict involving the assistant manager position, it does not matter because the result on remand would be the same. *Schomas v. Colvin,* 732 F.3d 702, 707 (7th Cir. 2013) ("[W]e will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."); *McKinzey v. Astrue,* 641 F.3d 884, 892 (7th Cir. 2011) ("[A]dministrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."). The record provides an alternate basis for the ALJ's finding that Chestine could perform her past relevant work such that a remand would be a "waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353

(7th Cir. 2010). The "manager, retail store" position appears to encompass an assistant manager retail position, and the VE testified that Chestine could also perform work as a retail manager, store manager, DOT 185.167-046. *See Sanford v. Saul*, 2020 WL 633743, at *3 (D.S.C. Feb. 11, 2020) (VE testified that the DOT does not differentiate between retail manager and assistant manager position); *Schulte v. Saul*, 2020 WL 247185 at *4 (S.D. Ill. Jan. 16, 2020) (VE noted that the "DOT does not contain an entry for assistant managers, but it does have one for retail store manager."); *Mercado v. Berryhill*, 2017 WL 3328177, at *3 (S.D. N.Y. Aug. 3, 2017) (VE explained that plaintiff's "position as an assistant manager at Walmart aligned with the Dictionary of Occupational Tiles ('DOT') code 185.167-046."). The job of "manager, retail store" listed in DOT 185.167-046 describes its job duties as "[m]anages retail store engaged in selling specific line of merchandise, such as groceries, meat, liquor, apparel, jewelry, or furniture." *See* DOT 185.167-046.[4] Although the ALJ did not rely on this job in her decision, Chestine does not argue that the DOT description for manger, retail store, DOT 185.167-046, does not match her RFC. Therefore, even if the decision was remanded due to the discrepancy between the assistant manager job and the management aid job identified by the VE, it would not provide a new result, as the VE testified that Chestine could work as a retail manager, store manager, DOT 185.167-046.

Finally, although not raised by Chestine as a basis for reversal, the Commissioner notes that the VE at the first hearing used a different DOT in classifying Chestine's past retail positions. The first VE classified Chestine's past work as "retail manager," DOT 299.137-010, which is a medium work job. (R. 68). When questioned by the ALJ at the second hearing about this discrepancy between the manager, retail store, DOT 185.167-046, light job identified by the VE

---

[4]        DOT 185.167-046 is available at https://occupationalinfo.org/18/185167046.html (last visited March 10, 2020).

at the second hearing, the second VE explained that her opinions were based on the DOT and the Disability Report – Adult and Work History Report provided by Chestine. (R. 212-18, 223-30, 872-73). SSR 00-4p is not implicated by this potential conflict because it is triggered only by conflicts between the testimony of the VE and the DOT. *Washington v. Berryhill*, 2018 WL 1950438, at *9 (N.D. Fla. April 25, 2018) ("Social Security Ruling 00-4p does not require the ALJ to inquire into or discuss conflicts between the testimony of a vocation expert at a first hearing and testimony by a different vocational expert at a second hearing after remand."). Moreover, because the VE at the second hearing provided "sufficient support" for her classification of Chestine's past work as manager, retail store, DOT 185.167-046, the ALJ properly relied on the VE's testimony at the second hearing and she was not required to discuss the vocational expert's testimony from the first hearing. *Villa v. Colvin*, 540 Fed.Appx. 639 (9th Cir. 2013); *Brando v. Colvin*, 2017 WL 2364194, at *23 (D. N.J. May 31, 2017) ("[W]here an ALJ properly relies on the testimony of one vocational expert, 'he need not address the testimony of another VE.'"); *Johnson v. Colvin*, 2015 WL 1954644, at * (W.D. Pa. Apr. 29, 2015) ("As a general matter the ALJ properly relied on the vocational expert's testimony from the Second Hearing, and as not required to address the vocational expert's testimony from the First Hearing."); *Wilcox v. Colvin*, 2013 WL 5201079, at *5 (D. Colo. Sept. 16, 2013) ("When presented with the two conflicting VE opinions, the ALJ could reasonably rely on the well-supported hearing testimony of the VE from the most recent hearing.").

## **CONCLUSION**

For these reasons, Chestine's motion for summary judgment [30] is denied, the Commissioner's motion for summary judgment [38] is granted, and the decision of the ALJ is affirmed.

**SO ORDERED.**

Dated:  March 10, 2020

_____
Sunil R. Harjani
United States Magistrate Judge